The court today is Munex Corporation v. Sandoz, case number 2010-37, a decision following trial and post-trial motions from the District of New Jersey. I have expanded with the agreement of the panel the arguments to 20 minutes per side, but I am going to try to stay within that despite the fact that I didn't do a great job on the last one to stay within it. But having said that, Mr. Jay, you want four minutes for rebuttal? If possible, thank you, Your Honor. Okay. Again, you're just going to need to pick and choose your battles wisely, I guess. Okay. Thank you. So, may it please the court, Immunex has already enjoyed the full term of multiple patents based on its invention of e-Thantercept. What it can't do is shield its multi-billion dollar franchise on that fusion protein for another full decade. There are multiple reasons for that, as Judge O'Malley just alluded to. When Immunex took over Roche's pre-GATT patent application, it was not permitted to use that to obtain a time-wise extension of what it already had, which is a patent on e-Thantercept. It also could not go beyond what Roche's original specification disclosed. So for both reasons, the district court committed legal error by allowing Immunex to have another decade of protection. The district court made a lot of findings. You know, said, okay, you lose on point A, but even if you didn't lose on point A, you lose on point B, even if you didn't lose on point B, you lose on point C, and about four or five down the line. So you're going to have to convince us that the district court, after a two-week trial and an 80-page opinion, got every single one of those wrong, right? So the district court did make alternative conclusions. So for example, on ODP, I agree that there are multiple steps that we are asking the court to take. Right, so we could win on ODP, we could win on written description. Each of those is separate. Why don't you address the ODP issue first and stick to that one for a little bit. Absolutely. And so you're right, Judge O'Malley, that the district court made a bunch of alternative conclusions, but we submit to you that each of those is a legal conclusion. The district court did not, can't insulate that by calling it factual findings for these reasons. Number one, what tests to apply, that's plainly a legal question. Number two, whether the, if you're looking at the FINK patents as a- But why don't you address whether the 2004 agreement transferred all substantial rights? I'd be happy to, Judge Rayner, because we do think that that is a central point, and let me just begin by saying that that, too, is a legal question, as this court has said in each of its all substantial rights cases, starting with the Vopel, that that's a question of law. In this case- This is, that's important, and maybe I'm just being too much of a law professor type here, but we keep saying that what's important, as is with respect to most contracts, intent of the parties. So is there, this is one of the first cases where we've gone beyond 12 v. 6 on this topic, so is there an issue with respect to intent that falls outside the four corners of the document that we're allowed to consider? I don't think so, for several reasons, Your Honor. So, of course, you're right that this court has referred to the party's intent, but, say, in the first case in which the court did that, it was alluding back to contract cases going back a long way, but not to this, a kind of contract like this one, whereas all, I think all of this court's cases, starting with Vopel, when it has looked at the party's intent, it's been dealing with an agreement between sophisticated parties, and it has looked only to the contract itself, because the contract is the best evidence of the party's intent, and that's especially so here. If you look at paragraph 11.12 of the agreement, the last portion of the agreement, which recites, as sophisticated parties generally do, that the agreement is the entire agreement between the parties. It's all written down. Governed by Delaware law, or do we have a body of law that should actually control this interpretation? So, on the question, what did the parties agree to, what was transferred, what was retained, you would look to Delaware law in interpreting the contract, but we think it really is just a pure question of law, because the contract itself says, these rights are retained, these rights are transferred. On the question whether that's enough to transfer all substantial rights, that's a question of federal law, that this court, applying the term patentee in the Patent Act, has interpreted as a legal matter, and that is really why we're asking this court to use that same test. So you think that the test for what we now know simply to be whether or not you qualify under the statute as opposed to standing, but whether you qualify under the statute as a patentee, that's a statutory inquiry. This ODP is an equitable principle that was designed as an exception to what would otherwise be governing law, and so why do we necessarily transport that statutory analysis into this doctrine? So to put a finer point on it, ODP is hard enough. Why would we want to introduce this incredibly additional complex inquiry into whether the patent owner here really has common ownership with another set of patents when they've structured some kind of licensing arrangement? So let me answer both of your questions together, because what we're asking the court to apply is a well-recognized test for determining what, as this court has said in at least half a dozen cases, who is the effective patentee after parties engage in a transaction like this. Patentee and owner are different things. Ownership would be governed by state law, right? Potentially, but with a term that we're asking you to look at in the statute. So if you look, for example, at the terminal disclaimer statute, 253B, that likewise refers to a patentee or an applicant who can file a terminal disclaimer. What is the only purpose of the terminal disclaimer statute? It is to cure an ODP problem. So it makes sense, as this court said in Longhi and in other cases, for the entity that's able to file a terminal disclaimer to be the entity that is on the hook for obviousness-type double patenting. If it owns another patent or application that's not patentably distinct. And so what this court said in Longhi, and I think Longhi is particularly significant because I take your point, Judge Chen, about there are some difficulties with applying this test, but the other side is proposing, you know, the test the other side is proposing has already been rejected by this court in Longhi, because it would rule out- The timing test has been rejected. The time of invention test, right, exactly. The idea that if at the moment of invention, even if it's going to be assigned to your employer as a matter of course, the next day, that that should be the test. We think that that's clearly rejected, not only by Longhi, but by decades of precedent from this court, I think collected in the Rogers decision footnote four, which is cited in Longhi itself. Just because we might not like either test that you guys propose doesn't mean that we think that we have to choose between one or the other. I definitely take that point, Judge O'Malley, but I do think that going to a test that is number one, this court's longstanding and I think now well-developed test for deciding who is the effective patentee makes perfect sense when you're deciding who is the patent owner for purposes of obviousness type double patenting. That is precisely because it is an equitable doctrine, it makes sense to look at substance and not labels, which is exactly what, starting with the Supreme Court's decision in Waterman, the all-substantial rights test does. That's one way in which it's entirely consistent with the purposes of ODP. Second, I think just as the facts of this case illustrate, when the second entity, like the recipient, has the opportunity to control prosecution, write the claims, exclude everyone else from the commercial exploitation of the invention, and enforce the patent to the exclusion of others, it makes eminent sense to... Just to clarify, for you, your position is we should whole hog transport our body of law on prudential standing, who is the effective patent owner, right into ODP for whether or not someone is a common owner of multiple patents. Yes? The whole thing. We are asking you to adopt... Or are there other possible, I don't know, sensitivities or different sensitivities that we would have in a different context, the context here of whether to apply obviousness type double patenting, that militate against just doing a mirror image or carbon copy of what we already have, or whether you have the right to sue on a patent. So I wouldn't think a case like this would raise any of the concerns like that, precisely because the recipient acquired all substantial rights in the patent application during prosecution. So the recipient had the ability to control what the claims were going to say, had the opportunity to control, to some degree, the timing of prosecution. So in answer then to Judge Chen's question, I thought that you were playing it a little more conservatively, that you weren't saying you should whole hog transport this analysis. You were saying more narrowly that at least where one of the rights transferred is the right to prosecute the patent, this analysis ought to inform and ultimately drive the inquiry. Are you now saying something broader? No. We think that what you just said, Judge O'Malley, is basically all the court would need to decide in this case, to decide that we're right, that all substantial rights were transferred, including the right to prosecute, at a time when the recipient was able to actually use that right, control prosecution, and get claims that the recipient itself was able to author. And then, of course, had the opportunity, if it wanted to, to cure the ODP problem by filing a terminal disclaimer, but did not do so. With respect to the substantial rights, then, what do you make of 3.6 of the agreement where it says that Roche retains the right to rectify infringement when Roche is the one to bring an action? Your friend on the other side is going to argue that that would then remove from MUNIX any authority to grant an assignment with respect to that alleged infringer. Just like in this court's Speedplay decision, you never get to the reserve right to sue because there's a 180-day waiting period, and during that time, MUNIX has the sole right to, as 3.5 of the agreement says, to rectify the infringement by granting a license or to bring suit. Those are exactly the facts that, in Speedplay— Well, now we have to get into the weeds of what really happened in Speedplay, because I think I agree with you that it could be one reading of Speedplay, but then Alfred E. Mann issued later and explained what actually happened and what was the pivot point in Speedplay. And there, we said in Alfred E. Mann that what really mattered was after that lawsuit had been initiated by the licensor, the lawsuit got basically taken away by the licensee who issued a sublicense to the defendant. It was a royalty-free sublicense, but nevertheless, it was illusory because after the secondary lawsuit, secondary right to sue had been triggered, then the sublicense had been granted. And in Alfred E. Mann, they said, yes, that's the same thing that happened in Alfred E. Mann, but there were pass-through royalties in that case. Here, assuming for the moment—I know there's an argument that the court understands this agreement to bar—I'm getting all the names confused—Immunex from granting a sublicense to a defendant after Grotius initiated that lawsuit, then the fact pattern here is outside of the fact pattern of Speedplay, given how we understand Speedplay through Alfred E. Mann. Am I missing something? So, I'm not sure I agree quite with your characterization, Judge Chen. I mean, so I certainly agree that what was doing the work in Alfred E. Mann was the royalty—the obligation to pass-through royalties from the sublicense. That's what the court said distinguished the case from Speedplay. And there's no such obligation here. The Immunex has the same ability to grant royalty-free sublicenses. And even if we get an argument about whether it could do so after Day 180, the fact is that it has the complete authority to do so before Day 180. So it has a lengthy period in which it gets to choose whether to sue or whether to prevent Roche from suing. And we submit that that's all that you need to establish that Roche's retained right is illusory, because during that time, Immunex has the sole right—and this is to quote the beginning of both 3.5 and 3.6—to rectify infringement, including by sublicense. And there's no obligation for the sublicensee to pay Roche a dime. So that's why we think this really is on all fours with Speedplay. If anything, in this case, the waiting period is longer than in Speedplay, where it was 90 days. At the same time, Immunex always had that right to issue that sublicense at any point in time, after the agreement was signed, right? Immunex has the right to issue a sublicense at any time. Yeah. So whether it was inside that 180-day window or before the 180-day window, my point is they always had that right. But once Roche files the lawsuit in compliance with the agreement, then Immunex is blocked. Well, that's the other side's argument. We don't agree with that, but we also don't think that the court needs to answer that question. And that's why I'm focusing on the 180-day point, because there is no argument that Immunex can't issue a sublicense during that first 180-day period. There is no such argument. There could not be such an argument in light of the plain text of the agreement. We think that that is what materially puts this case on all fours with Speedplay. Assuming you get past the all substantial rights, let's go to the one-way versus two-way. I mean, you said that all of this were legal determinations, but there were specific factual findings that the trial court made about diligence and about, really, who was at fault here. I mean, you got some pretty egregious conduct out of the PTO on this, right? Losing the file, admitting that they hadn't even done anything for five years, ignoring all the requests for a status report. I mean, there's a lot here. Why isn't that enough to say that we should use the two-way analysis? It's not enough. So let me first address the standard of review, because I think that's important, because implicit in your question is how much of this is legal. And then let me address why the legal conclusion is wrong. So first, the standard of review. So from Emert, In re Emert, this court said that it's a legal conclusion, which tests to apply, and specifically, the conclusion to be drawn from the dates. It does say underlying facts, though. Sure. So what happened on what day? It's just like time constructions of legal, as long as there's not an underlying factual finding. Yes, that's right. And so here, what happened is a matter of historical fact. That's established, and I don't think is disputed. But what conclusions you draw about whom to attribute fault to, that we think, under Emert and all of this court's two-way test cases, which I should say, really, almost all come out as one-way test cases, that is a legal conclusion. And so, as I just alluded to, this court has always said that the two-way test is a very narrow exception. It only applies when the PTO, and solely the PTO, causes the second patent to issue after the first patent, when it would have issued in the opposite sequence. That's not the case here, because if you look at the Delta- Well, almost every one of the cases where we didn't find the PTO solely responsible is distinguishable from the facts here. I mean, it makes me a little nervous to say that anyone who just asks for normal extensions, by definition, you're at fault. I take that point, Judge O'Malley. So let me just begin by saying, we are not relying just on normal extensions here. Now, In re, Emert talks about extensions as one factor to look at, but this is far beyond just normal extensions, because most fundamentally, what you have here is the recipient of all substantial rights. When Immunex comes in a decade into prosecution, gets rid of the P55, which has been what has been prosecuted for a decade, and swaps in P75. And so, quite naturally, that is going to extend the time necessary to examine this case. It really is erasing a decade of progress and going back to the beginning, and that is on the applicant, just like in In re, Basel. You look at the changes that are made to the application in deciding who caused what period of delay. We're certainly not saying that the PTO did not cause any portion of the delay. But the question that you are asking is, did the second patent issue after the first patent? And so here, there are two patents. The largest delta is about a little under 13 months. So did the applicants cause at least 13 months of delay? And both because of the change in the application, and because of their failure to respond to PTO notices saying that certain claims were allowable, and because of time that they took during prosecution, extension after extension. All of that adds up to, you can't say that the PTO was solely responsible for the delay, and solely is the test, and this court has said in case after case, that it means it. You know, that in order to protect the public against unjustified time-wise extensions, you apply the one-way test, except in this really exceptional circumstance, which is not good. So your argument is that the Eli Lilly case supports your position that this is a one-way case? Yes. Absolutely. The 690 Jacobs patent? Yes. Is the priority date 1989 or 1992? The Jacobs patent, I believe, is 1989. But a CIP was filed in 1992. That's correct. So does the claimed invention in the 690 patent have sufficient support going all the way back to 1989? I guess the question would be whether that would matter for purposes of ODP, right? Well, the Roche patents, as I understand them, their priority date goes to 1990. Right. So now we have to figure out which one was really the first file, the Roche patents or the Jacobs patent. If Jacobs gets 1989, then the Jacobs patent is the first filed application. If Jacobs' priority date is 1992, then it's the Roche patents that were the first filed application. But these are both pre-GATT patents, right? And so the term is 17 years from issuance, and as this court has said, you look at the issuance date in deciding what's an appropriate reference patent in that case. Yes, but I'm just trying to understand one-way versus two-way. One-way versus two-way. Oh, I see. You look at, okay, which one was the first one filed, and was that first one filed the second one that issued? Well, but if we're looking at filing and not priority, I certainly understand that point. Jacobs was filed in 1995. Yes. My understanding of one-way versus two-way is you look at the priority date, the first filed application. Well, you look at it, you look at the priority date only in this sense, I think, because if you're not looking at time in prosecution, but you're looking at kind of this distinct question, could the patentee have, in one of the earlier applications that that same patentee had prosecuted, have claimed the same invention? So was there an opportunity to do so? And so here, the answer is yes, the patentee did have an opportunity to do so, because it did so in Jacobs. So I don't think that whether it could do so with the full benefit of the 1989 priority date has ever been held to be... Then we have the somewhat bizarre question whether the 690 even covers the TANF sentence, right? We do have that question, which, of course, is just a matter of claim construction, and I think that the district court got that wrong. If you look at Claim 2 and Claim 5, which is what the other side says was the basis for its having labeled its multi-billion dollar product with this patent for a long time, they say, well, that was just Claim 2 and Claim 5. Claim 2 and Claim 5 claim a TNF receptor. Etanercept is not a TNF receptor. Etanercept is a fusion protein, just like what's described in Claim 3. I think that the only way to read this, and also the insertion of the exemplary language into, which is at 27307. One specific example of a TNFR-FC fusion protein is, and then there's some... But that issue with respect to the marking, that was one where the district court did rely a lot on expert testimony, right? So the district court, no, I don't think that that's right, Your Honor. The district court concluded that this patent did not claim etanercept based on the district court's construction of the constant domain, and whether the constant domain has to be in a completely unmodified constant domain. Okay. You're going to have to stop. I'll restore your four minutes for rebuttal. I'll give you five minutes extra if you need it. Thank you, Your Honor. Mr. Trella? Okay. Thank you, Your Honor, and may it please the court. I want to talk about ownership for ODP purposes and all substantial rights and all that, but I... Can I just do... Sure, of course. I want to understand Immunex's portfolio, excluding the Roche patent for the moment. Sure. What patents does or did Immunex have that were directed to, or I guess covered, etanercept? Well... The 690 and then the 225, which is a method of treatment. Well, really, none other than there are some, what we call the Fink patents. There were two other Fink patents. The 225 is a Fink patent. It's a treatment method. A method of treatment of specific... For example, the Fink 225 is a method of treating psoriasis, providing for certain clinical results, and so on. And then you mentioned the Jacobs patent, which is actually what I wanted to talk about before I get to the broader ownership questions, because that's what Mr. Jay was talking about. Jacobs was filed in 1989. There was a continuation in part in 1992, where they tried to get a claim to etanercept, but it was rejected because it was not supported by the 1989 application. And so Immunex dropped the attempt to get that claim, because it wanted to keep that priority date. Now, Mr. Jay mentioned claims two and five of the Jacobs patent, and that is why it was listed on the Enbrel label, because those are comprising claims. He made it sound like they were limited to a TNF receptor. They're not. They're methods of treatment comprising administering a TNF receptor. Well, that's why they were put on the Enbrel label, because... TNF... I think the Jacobs claims are broader. They're just any TNF receptor. So they would cover etanercept, because it uses a TNF receptor, but they don't define etanercept. They're not fusion protein claims. Claim three, which is the only claim they relied on for ODP purposes, as to Jacobs, claims a chimeric antibody, and as the district court explained, that as the claim language indicates, and as the specification indicates, it requires unmodified constant domains, and that's not etanercept either. District court also found that etanercept would not have been obvious in light of that claim properly construed, and they don't even challenge that on appeal. So, claim three doesn't cover etanercept. Claims two and five are not the basis for the ODP argument, and they just claim TNF methods of treatment using TNF receptors. And so, Jacobs is just, it doesn't apply at all. Now... So, let's go back to the think patents. So, you concede that if we find all the way through that the district court was wrong, and we get to the point of one-way versus two-way, if it's one-way, then ODP applies. No, I don't concede that for two reasons, Your Honor. First of all, there's been a lot of focus, and particularly in Sandoz's brief on the 1A2 patent, which is the patent that claims the etanercept compound. We shouldn't forget the 522 patent, which claims methods of producing the fusion protein. Now, a claim to a method of treatment using a compound doesn't tell you anything at all about how to produce that compound. They don't make any argument. If you look at their briefs, there's no argument that somehow the 522 claims to methods of producing etanercept are made obvious by a claim to a method of treating plaque psoriasis. Once you have possession of the etanercept compound, is there something in your claimed method of producing it that makes it a non-obvious way of producing it, the possessed known compound of etanercept? Well, sure. Well, first of all, their separate obviousness case as to those claims failed. So, there is that. And, for example, one of the asserted claims in the 522 patent claims using a particular kind of host cell, the CHO, Chinese hamster ovary cell, to produce etanercept. There's no way you read the thin claims and know anything at all about that. The District Court didn't reach this precise issue, right? Well, the District Court found that the two-way test applies, so correct. Although, there's a footnote. I don't have it right in front of me, but there's a footnote in that part of the District Court's discussion where the Court notes that the same issues and arguments would apply under the one-way test. I don't want to, I think it might be going a little too far to say that she was holding that, but she did seem to think that the analysis might well be the same under the one-way test. So, as I was saying on the 522, there's nothing in a method of treatment claim that tells you anything at all about how to produce the compound. And even as to the compound claim, if general foods is still good law, and I have no reason to think it's not, it says you have to look at the claims for ODP purposes in their entirety. You can't just pick out one step of a claim process or one component of an apparatus or compound claim and say, oh, well, this later claim would have been obvious in light of that one component. And in general foods, the Court even said, even where that one component describes the essence of the later claimed invention. So, we think under the general foods approach to ODP, even the 1A2 compound claims are not obvious in light of the FINK method of treatment claim. So, let me go back to the threshold ownership questions. They're really, Sandoz is really asking the Court to make some pretty surprising new law here. First of all, the statutory basis for all of this is not the statute that refers to patentees. It's section 101, which refers to one who invents or discovers. So, that's the basis for our position that the correct ownership test is the entire ownership of both at the time of invention. Because that links it back to the statutory foundation. Didn't we reject that in non-FINK? Well, I don't think you did, Your Honor, because Lunge was decided in 1985. Which was, and in other words, the case actually was developed before the 1984 amendments to the statute, where Congress noted, and we cite the legislative history, when Congress amended 103 to provide for the exclusion as prior art of references that were commonly owned at the time of invention, even if they had different inventors, Congress in the legislative history said, and basically we expect the PTO to reinstitute common ownership-based double patenting to deal with this loophole. In fact, the CCPA for decades had been also expecting the PTO to do that, and had been telling the PTO that its 1967 OG notice made no sense and was not in compliance with their own law. At least according to our predecessor court, the law of applying ODP to a common owner of two different patents or patent applications with different entities was always good ODP law. Yes, I understand, 1984 came along and Congress did this carve out to 103 and 103C1, but I don't really understand obviousness double patenting, which had been in existence for decades when it comes to common ownership with different entities. Well, I think that, I don't know that it's a tail wagging the dog, but I think ODP is obviously a doctrine that's evolved over the years, and what we've got with the 1984 amendments and the legislative history is a pretty clear indication from Congress of what it thought the scope of common ownership ODP ought to be, and it also happens to be consistent with the governing statute, which is 101, which talks about one who invents or discovers can only get one patent on that invention, and that is the standard that's now embodied in the MPEP, the Patent Office Guidelines. What about In Re Man, which the other side cited in its gray brief, and I think it's a CCPA opinion. It is. In Re Man is actually not really a double patenting case, it involves what was called the doctrine of election, and it was decided in about 1935, before the 1952 Patent Act, and importantly before 102G became part of the statute, and In Re Man was dealing with a situation where there's common ownership, and normally you would declare an interference, which was the Patent Office practice at the time, but they couldn't because there was no adversity since there was common ownership, and the Patent Office basically said, look to the common owner, and said, well you need to elect, you tell us which is first, and that's the one that's going to issue. So that was actually a different situation, and the law changed quite a bit since then. So you think that it would be okay if some independent inventor invented something, and then the next day sold that to a big company like Immunex, and then now Immunex owns the rights to file a patent application on that invention that had just been created the day before, and then that wouldn't constitute common ownership for possible ODP with respect to some of Immunex's patent portfolio? Because in your view, Immunex did not own that independent inventor's invention at the time the inventor made it. That's right, I don't think it would be common ownership for ODP purposes, and I don't think that's going to be a problem because the 103C Safe Harbor won't apply because there was not common ownership at the time of invention, so the earliest invention is going to preclude the others, assuming that they're not patently distinct. But I don't think we've ever said that it's an either-or proposition. No, that's correct. You either get the Safe Harbor, and only then will ODP apply. I don't think we've ever said that. No, I don't think you've ever said that. I don't think the issue's ever been squarely presented to the court, so you haven't not said it, I guess, but correct. But we have repeatedly looked to the date of the issuance of the patent. You have, you have. Maybe not thoughtfully, but we have. I certainly wouldn't say that. And I say that because a couple of them are my opinions. Let me talk about all substantial rights then. Now, that's never been applied in the ODP context, and there are good reasons for that. One is that it doesn't really deal with who owns a patent, for ODP or any other purposes. It's, are the right parties before the court, so that the defendant doesn't have to worry about a series of suits from people claiming various bundles of rights. Let's just assume, well, it's not an assumption. ODP is all about trying to prevent mischief, gamesmanship. You know, really expanding patent term, and controlling exclusivity over something that really should be dedicated to the public. And so, it's an equitable doctrine. It's an equitable judgment doctrine. And now, we can imagine there's all kinds of scenarios where parties will structure deals in a way that gives a second party everything but technical ownership. And, and it seems that, that would be the sort of thing that ODP would want a police against to block a party from controlling a patent term for 30, 40 years. It is an equitable doctrine. It is not an equitable doctrine untethered to the statute, though. So, I think it's, it's not just this free-roving, policy-based judgment to go around looking at patents that you may or may not think are appropriate. So, that's point one. Point two is equitable judgments are typically made, in the first instance, at the district court level. The district court looked at this, found that there was no gamesmanship, no dilatory conduct on the part of Immunex. Also, incidentally, there had been a latch, a prosecution latches defense asserted originally. That was abandoned. So, there's no, there's none of this fooling around that might be a legitimate concern for the ODP doctrine. How else do we determine ownership, though? Putting aside the timing question. What other factors would we consider? I admit that it's a separate statutory provision that we're trying to apply, but we are still trying to determine who is sufficiently the patent holder, patent owner, for purposes of being able to bring a lawsuit. So, why aren't the factors at least informative, if not determinative? Well, I'm not sure that the All Substantial Rights Test is actually trying to decide who is even sufficiently the owner to bring a patent, or patentee. For example, an exclusive licensee has standing to sue. The question is, does somebody else have to be there with him? So, I think there's a mismatch between the doctrines. But let me talk about, even assuming that you apply it here, why Sandoz failed to make the case that Immunex received All Substantial Rights from Roche. And Judge Chen, I want to talk a little bit about the point you made about Alfred E. Mann and its reading of Speedplay. It's actually a stronger, it's stronger in support of the District Court's decision, even than it seemed. What about the royalty passable? Well, that's what I'm getting to, Your Honor. In Alfred E. Mann, and this is at page 1361 of the opinion, there is that royalty passable. But the court also says, before it even gets to that, that the licensee, in that case, which had the first right to sue, could sue and settle immediately for nothing, without any requirement for approval from the licensor, and notwithstanding that, the backup right to sue, the second right to sue, was still a substantial right. So it's true that they couldn't have the sublicense, but they could file a suit and then just let the defendant off, and that still did not negate the substantiality of that second right to sue. Because of the pass-through royalties. I'm sorry? Because of the pass-through royalties. No, and that's the important point. They could sue and settle for nothing. They didn't have to be any royalties. They could just give them a release. And nonetheless, the second right to sue was still a substantial right. And the court was very clear about this. And again, as I said, it's at page 1361 of that opinion. So that's on Alfred E. Mann. But even before that, one of the, I think, Judge O'Malley, you mentioned the intent question. And all of the court's cases on the all substantial rights test mentioned intent as a separate element of the analysis. It's true that in most cases, the district court will just look to the terms of the agreement. Here, the district court also heard testimony, both from an Immunex witness and from a Roche witness, confirming that the intent of this agreement was to provide a license, not an assignment. So I'm not suggesting that if everything else pointed to an assignment, I'm not suggesting that testimony would be enough to override it. But it is part of the analysis, and there's no challenge at all to those findings by the district court. The court found the Immunex witness credible and specifically found that the intent was for a license. And the agreement confirms that. Do I understand that the testimony essentially was that they didn't want Roche to get away completely because they knew they would need cooperation and they didn't want them to be a third party for purposes of discovery? It was they wanted them to be a party to any litigation so that they would participate as a party. They also wanted them to continue to be the owner because of continued patent office procedures. And they wanted Roche to be subject to the duty to be candid with the patent office, et cetera. And the district court heard that testimony and found it credible. Now, what about that one feature of the agreement where Immunex retains the right to just get an outright assignment for a mere $50,000, which is a lot to me, but maybe not to Immunex at all. Isn't it like just one day worth of sales? Oh, gosh, it's a minute. Well, here's the thing. The accord and satisfaction, essentially what Immunex bought was an option to get an assignment. That was part of the $82 million that they paid for the accord and satisfaction. The $50,000 you can think of in law school terms as the peppercorn. The additional consideration to support that additional step of an assignment, it was not a valuation in any sense by either side of what the assignment would be worth. It was simply to provide the necessary contractual consideration so there wouldn't be some technical problem later if they requested an assignment. Now, the assignment point... But it's an illusion, isn't it? No, I don't think it's an illusion at all. And then Roche can't disagree? They have to sign? Well, that's because part of the overall transaction was the acquisition of the option for the assignment. Now, the assignment point raises another issue, and this is very important under this court's all-substantial rights jurisprudence. Roche can block any assignment by Immunex of its rights under the agreement. This court, in at least one case, has said that's fatal to an argument that all substantial rights have been transferred. Other cases have said, in effect, the right to transfer property is a key hallmark of ownership, and if you don't have the right to transfer, you're not the owner. Immunex does not have the right to transfer, and now that's in contrast to Wyeth, which was involved in the non-North America patents that were at issue in the agreement. Wyeth does have the right to transfer its patents. It can't transfer its rights under the agreement because you can't transfer contractual rights because you're subjecting the other party. It wasn't a straight-out assignment to Wyeth? Exactly. Yeah, that's my point, Your Honor. That's why they can transfer, because they got it. Well, exactly. And Immunex can't transfer because it didn't get it. That's really the point. So you've got that. You've got the second right to sue, which we think under Alfred E. Mann and this Court's other cases is a substantial right in this case. Once that 180 days elapses, it's Roche and only Roche that has the right to rectify infringement. It has complete control over a lawsuit. It keeps any proceeds. It's Roche's claim at that point. What's your response to Mr. Jay's contention that that 180 days means that you effectively get the control because you get to sit and look at it and say, if we don't want this person sued, we'll just give them an assignment? Well, you mean a sublicense? A royalty-free sublicense. Well, first of all, in every case where there's a second right to sue, that's going to be true. The person that has the licensee or whomever has that first right to sue can do something to cut off that second right to sue. But that doesn't make the second right to sue insubstantial. Again, Alfred E. Mann, it's not the only case, but it's a clear example of that. So the fact that the first right to sue might be exercised in a way that will mean that the second right to sue never comes into being, well, that's just inherent in any second right to sue and it doesn't make the second right to sue insubstantial. The other factors here are that at Roche's insistence, Roche retained the right to practice the patents for non-clinical research purposes. Sandoz belittles that right, but it was important enough to Roche that they insisted on it, and it was a right that Immunex believed they wanted to keep because the concern was that Roche was likely developing, trying to develop a competitor to Enbrel. They ultimately didn't, but that was... We've never, in any opinion, relied on that as a pivot point. No, and I'm not suggesting that it is standing alone, Your Honor, but again, this is an inquiry where you're looking at the transaction as a whole, and there are a bunch of reasons that this is not an assignment. It is just a license, and that's one of them. And another example of that is the provision dealing with what happens if Roche goes into bankruptcy, a provision that you wouldn't need at all if this had been a transfer of these patents to Immunex rather than just a license. That provision only makes sense if this was a license. So for a variety of reasons, we don't think that the all-substantial rights test is the right test, but if the court applies it, we think, as the district court did, you come out saying this was a license, this was not an assignment, and there is not the required common ownership for purposes of ODP. There are a number of other issues in the case. I'm happy to talk about any of them if the court has no further questions. What about... You did touch on the one-way versus two-way, but what about the fact that these precise claims didn't come in until much later? Well, these precise claims didn't come in until much later, and this is... Actually, I'm glad you asked that, Your Honor, because this is something that I wanted to mention. This is something I wanted to address. It reminds me of In re Basel, where in that particular case, the applicant waited nine years before introducing claims that resembled the claims that ultimately they sought, and here, as I understand the Roche patents, their priority dates are 1990, then they file their pre-GATT in 1995, and then these claims, when Immunex finally got their hand on the wheel and held the pen, they introduced these claims in 2004-2005, so that's roughly 15 years after the priority date of these Roche patents. I mean, that's about as per se as you can get, I think, when it comes to trying to understand why was it that the first filed applications issued second, and here we have an initial 15-year dormant period before the applicant sought these P75 IgG1 claims. Well, that's not entirely accurate, Your Honor, and Mr. Jay, when he was up here, made a comment about how it was not until late after Immunex got control that Immunex got rid of P55 and suddenly introduced P75. Well, that's just not right. First, the original claims in the original application would have covered e-tanner set. They covered fusions of a, I've got the language here, soluble fragments of either P55 or P75, fused to an IgG1 or IgG3 immunoglobulin, so they were broader than these claims, but they would have covered it. The constant regions except for the first constant region? That language was in there. That language was in there? Yes. And it also said P75 in the claim? No, the claim referred to soluble fragments of TNF binding protein and other... That includes... Includes P55 as well. P75 and a lot of other things. Sure, but my point is that this notion that covering P75 fusions was a creation of Immunex is just... It isn't true. In 1994, way before Immunex was on the scene, the Patent Office issued a restriction requirement between P55 and P75 constructs. So again, the Patent Office, right from the beginning, saw that the application applied to P75. Now, Roche elected to go for P55 first. It got the 279 patent in 1997, which had claims to a fusion of P55 and IgG1 specifically. It filed divisionals in 1995 to preserve the prosecution of the P75 compound and method claims. And those are the... It's from those divisionals that these two patents emerged. Did the district courts say anything about this period of time between 1990 and 2005? Not specifically. As I recall, she was focused on the period of 1995 to 2011-2012. Well, I don't know if she was focused on... I mean 2005 to 2011-2012. Well, I don't know that she was focused on that because I think when she was talking about five years with no action and losing the file and all that, that actually spanned the entire period. It wasn't... I don't think it was just focused on that post-2005 period. So she was describing the prosecution in general. So this notion that somehow Immunex arrived on the scene and all of a sudden these claims are transformed, it's not accurate. And I'll just make one other quick point on that. In 1998, Immunex, having seen the European application, which stemmed from the same priority application which had been published in the meantime, Immunex sought out a license to cover it because it was launching Enbrel. So even back then, Immunex saw that Roche could get P-75 claims, as it did several years later when the European patent issued to P-75 IgG fusions that again would cover E-10 or so. So apparently the notion is that Immunex went out on its own in 1998, saw these applications that had nothing to do with E-countercept, voluntarily paid millions of dollars for a license that it apparently didn't need. I guess what the scheme of then later, we'll have this other transaction, we'll get control and then we can really repurpose, which is the term that's used often in Sandoz's brief, repurposes to cover E-countercept. It's inconsistent with the history, it's inconsistent with the district court's findings and we respectfully submit the decision should be affirmed in all respects. Thank you. Thank you, Your Honors. Just a couple points each on the test, the transfer of all substantial rights, and then the reference patents. So on the test, I think that you heard my friend say that their test is the moment of invention and that it's enough that they're, as Judge O'Malley brought out with her question, it could be transferred the day after invention. And the agreement is structured in such a way that even the payment of a peppercorn leaves some right in the transfer or that's not a transfer of all substantial rights. Accepting either half of that argument would really create a very well, a very easy to follow pathway to avoid, obviously, type double patenting. It's an equitable doctrine that this court should apply to prevent exactly that kind of unjustified time-wise extension. So on the test, both the legislative history of the 84 statute and the 84 statute itself are discussed in Longhi. And what does the legislative history say? Both the Senate report and Congressman Kastenmeier, the House chairman, had referred to ODP being applied to commonly owned applications, commonly owned applications, not this moment of invention test. And likewise, if you look at the MPEP to this day, it talks about a common owner or assignee, even in MPEP 804. The court doesn't have to apply the same test for what used to be 103C and is now in 102. It stands to reason that there doesn't have to be the same test for an exception to prior art which should be a narrow exception versus an exception to obviously type double patenting which would allow you to get an unjustified time-wise extension. Let me just talk a little bit about the rights that each party got out of this agreement because it's certainly true that Roche retained some rights. But our point is, and under the case law, what matters is they weren't substantial rights. And in particular, on the non-commercial right to practice, I just point to this court's decision in Luminara which squarely held that even a commercial but non-exclusive right to practice was not good enough. On the reference patents themselves, so first on the two-way test and the change in the application. So the original claim in this application, to the extent that it talked about a P75, it was the figure four sequence, P75. And Roche said over and over again to the patent office, we're not trying to claim the Smith sequence. We're not anticipated by Smith. We're not trying to claim Smith. And so along comes Immunex after the accord and satisfaction and really does start to claim the Smith sequence, P75, 10 years in. And then on the 690 patent, I didn't hear my friend respond at all to the point that we made about the example in the specification. This is dealt with at page 45 of our opening brief and 19 of our reply, where there's an example that says, one specific example of a TNFR FC fusion protein is, and then both sides experts agree that the sequence ideas that come next are etanercept. The 690 patent claimed etanercept. They had a full 17-year pre-GATT opportunity to exploit that invention. They marked their billion-dollar invention with it. And they had the opportunity to enjoy a full patent term. If the court has no further questions, I just want to close by saying that we appreciate the court hearing this appeal on an expedited basis. Sanders has approval and stands ready to bring the first biosimilar to this product. Thank you.